IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| PASSALACQUA,<br><br>Plaintiff,<br><br>v.<br><br>CITY OF PHILADELPHIA, et al.<br><br>Defendants. | CIVIL ACTION<br>NO. 14-5618 |

## OPINION

**Slomsky, J.**                                                    **December 2, 2016**

## I.    INTRODUCTION

Before the Court is Defendants' Motion for Summary Judgment (Doc. No. 38) and Plaintiff's Response.  (Doc. No. 42.)  Plaintiff Gerald Passalacqua is a former Philadelphia Police Officer who brought a civil action against former Police Commissioner Charles Ramsey, Lieutenant Thomas Wixted, Sergeant Thomas Meehan, Internal Affairs Investigator Sergeant Jacob Williams, and the City of Philadelphia alleging violations of federal and state law.[1]  (Doc. No. 29 at 1.)

---

[1]   Plaintiff originally brought eleven claims against Defendants.  (Doc. No. 29.)  The following claims were raised:
1.   First Amendment violation under 42 U.S.C. § 1983 (Count I)
2.   Second Amendment violation under 42 U.S.C. § 1983 (Count II)
3.   Fourth Amendment violation under 42 U.S.C. § 1983 (Count III)
4.   Fifth Amendment violation under 42 U.S.C. § 1983 (Count IV)
5.   Fourteenth Amendment violation under 42 U.S.C. § 1983 (Count V)
6.   Monell violation under 42 U.S.C. § 1983 (Count VI)
7.   Whistleblower claim in violation of Pennsylvania's Whistleblower Law, 43 P.S. § 1421 (Count VII)
8.   Intentional Interference with Contract claim (Count VIII)
9.   Intentional Infliction of Emotional Distress claim (Count IX)
10.  Pennsylvania State Constitutional claim in violation of P.A. CONST. art. 1, §§ 1, 7, 25-26 (Count X)

## II.   FACTUAL BACKGROUND[2]

### A.   Plaintiff's Employment with the Philadelphia Police Department

In August of 1993, Plaintiff was hired as a Philadelphia Police Officer.  (Doc. No. 38 at ¶ 1.)  In 2012, he was transferred to the Narcotics Field Unit South where Defendant Sergeant Thomas Meehan served as Plaintiff's immediate supervisor and Defendant Lieutenant Thomas Wixted served as Plaintiff's second-level supervisor.  (Id. at ¶ 2, 3.)

### B.   Plaintiff's Report of Corruption

The catalyst for the dispute in this case occurred in August of 2012 when Plaintiff reported corruption within the Philadelphia Police Department's Narcotics Unit to Lieutenant Wixted.  (Doc. No 29 at 5.)  Both Plaintiff and Defendant Wixted were on vacation when they met at a bar in North Wildwood, New Jersey.  Plaintiff told Wixted about the corruption, which involved Sergeant Meehan and others in the Police Department.  (Doc. No. 38-2 at 74:20-75:23, Aug. 12, 2015.)  Plaintiff claims he also reported corruption to the Federal Bureau of Investigation ("F.B.I").  (Doc. No. 29 at 5.)  "Plaintiff reported that Defendant Meehan was

---

11. Pennsylvania State Constitutional claim in violation of P.A. CONST. art. 1, § 11 (Count XI).
(See Doc. No. 29 at 13-28.)

In Plaintiff's Reply to Defendants' Motion for Summary Judgment (Doc. No. 42), Plaintiff withdrew his Fifth Amendment claim (Count IV); his Whistleblower claim in violation of 43 P.S. § 1421 (Count VII); and his Intentional Interference with Contract claim (Count VIII). (Id. at 28, 33.)  This Opinion will address the remaining claims in Defendants' Motion for Summary Judgment.  (Doc. No. 38.)

In addition, Richard Ross, Deputy Commissioner, was originally named as a Defendant. (Doc. Nos. 1, 29.)  Counsel for the parties agreed that Richard Ross should be removed as a Defendant at the pre-trial conference held with counsel on November 30, 2016 in Chambers.

[2]  The facts are set forth in the light most favorable to Plaintiff as the non-moving party who disputes whether summary judgment should be granted.

improperly requiring his subordinates to list him as a 'witness' on property receipts, thus allowing Meehan to receive unearned overtime through court overtime pay for being required to appear in court." (Doc. No. 42-2 at ¶ 4.)

Plaintiff alleges that he tried to report this corruption to the F.B.I. (Doc. No. 42 at 2.) Defendants claim Plaintiff did not report Meehan's actions to anyone other than Wixted. (Doc. No. 50-1 at 2.) Plaintiff called the F.B.I. to speak to a former Narcotics Field Unit officer who worked there. (Doc. No. 38-2 at 85:6-87:6, Aug. 12, 2015.) Plaintiff was unable to speak to his former colleague and that was "the only phone call" he made to the F.B.I. about the improper property receipts. (Id. at 87:3-6.) Plaintiff also expressed concern about the improper property receipts to officers on his squad. (Doc. No. 38-2 at 93:2-17, Aug. 12, 2015.)

### C.  September 26, 2012 Latona Street Incident

Next, on September 26, 2012, Plaintiff received a phone call from a 4th District police officer who responded to a report of gunshots and found drugs in a home at 1236 Latona Street. The officer needed to search the home and requested Plaintiff's assistance in obtaining a search warrant. (Id. at 97:4-99:10.) Plaintiff called Defendant Meehan and informed him of the request. (Id. at 100:2-07.) Meehan then went to 1236 Latona Street, met on-site officers, and was informed that drugs and money were inside in plain view in an open pocketbook and a cosmetics bag located in the second floor front bedroom. (Doc. No. 38-3 at 17:1-18:14, July 15, 2015.) In that room, Meehan recalled seeing narcotics and a cosmetics bag containing money located on a table near the bed and an open purse lying on the bed. (Doc. No. 38-3 at 31:5-34:21, July 15, 2015.) Meehan went to the bedroom and counted the money prior to Plaintiff's arrival on the scene. (Id. at 38:10-16.)

3

In his deposition, Plaintiff provided a different version of the events about the bags and money.  Plaintiff spoke to two officers at the Latona Street home who gave him information about the investigation and showed Plaintiff the two bags containing money and drugs.  (Doc. No. 83-2 at 108:3-21, Aug. 12, 2015.)  Plaintiff picked up the bags and dumped the money onto the bed in the front bedroom.  (Id. at 118:8-119:1.)  While dumping the money, another police officer was present.  (Id.)  Thereafter, a short time later, Meehan returned to the front bedroom, collected the money, and recounted it.  (Id. at 133:14-19.)  Defendant Meehan stated there was money missing.  (Id.)  Plaintiff voluntarily stripped to show Meehan that he had not taken the missing money, and no money was found in Plaintiff's clothes or in his car.  (Id. at 136:11-139:13.)[3]

Defendant Meehan then had Plaintiff and the other two officers walk in a line from the front bedroom to the outside of the residence.  (Id. at 141:15-22.)  At the time, Plaintiff possessed a personal firearm.  (Doc. No. 38-2 at 142:21-146:24, Aug 12, 2015.)  His duty weapon was located in his car.  (Id.)  Police personnel took the gun from his person.  (Id.)  Plaintiff deemed these events as "odd" behavior.  (Id. at 142:21-143:12.)  Once it appeared that the money had gone missing, another squad of officers and officers from the Police Department's Internal Affairs Unit were called to the scene to complete the investigation.  Among those officers who arrived was Defendant Jacob Williams from Internal Affairs.  (Doc. No. 38-3 at 65:9-12.)  At the scene, Defendant Williams told Plaintiff to reenter the Latona Street house, and asked Plaintiff to strip again, this time in the presence of Defendant Wixted and Captain Kelly, who is not named as a Defendant.  (Doc. No. 38-2 at 145:4-147:22.)   He did so.  (Id.)

---

[3]   On September 27, 2012, the missing money was found in a couch downstairs at the Latona Street address.  (Doc. Nos. 38-3 at 73:15-18, July 15, 2015; 38-6.)

Next, Plaintiff was transported to Internal Affairs ("IA") where he was informed that he was the target of an investigation into the theft of the money.  (Id. at 171:5-174:1.)  While there, Plaintiff learned that his police firearm was seized from his car while he was being transported to IA and that he was being relieved of this firearm, which is also referred to as a duty weapon.  (Id. at 174:3-10.)  He filled out a form which relieved him of this weapon and his personal weapon, and was informed that his work assignment was being transferred from the Narcotics Field Unit to the Differential Police Response Unit ("DPR") until further notice.  (Id. at 33:17-23.)  Plaintiff was disappointed with the transfer to the DPR because he would be paid less than he was as a Narcotics Field officer.  (See Id. at 182:12-19.)

Plaintiff took vacation time after the Latona Street incident and then reported to the DPR for an unspecified time thereafter.  (Id. at 181:16-182:11, Aug. 12, 2015.)  Approximately a day after the Latona Street Incident, Wixted called him to make arrangements to give him the paperwork for his personal gun.  He signed the pertinent document and later received his personal gun from Defendant Wixted.  (Id. at 184:20-185:15, Aug. 12, 2015.; Doc. No. 38-4 at 15:22-16:13, Dec. 30, 2015.)

### D.  Internal Investigation and Subsequent Disciplinary Action

On September 26, 2012, Defendant Williams began investigating Plaintiff's involvement in the Latona Street theft.  (Doc. No. 38-5 at 122:2-7, July 15, 2015.)  Williams sought a warrant for Plaintiff's DNA and fingerprints.  (Id.)  The DNA was collected by oral swab on October 4, 2012.  (Id.)  The DNA was tested against the DNA found on the money at Latona Street.  (Doc. No. 38-5 at 65:15-68:24, July 15, 2015.)   Inconclusive results were produced.   (Id.)  Additionally, on October 4, 2012, Plaintiff's name was released to the Daily News by "Ramsey,

. . . Williams, and/or the Does." (Doc. No. 42-1 ¶ 28.) Plaintiff states he was "identified by these defendants to the Daily News' [sic] to be under investigation for taking the $880.00." (Id.)

On February 14, 2013, Plaintiff was interviewed by personnel assigned to Internal Affairs. (Doc. No., 38-9 at 2.) The Internal Affairs investigation led to further consequences for Plaintiff. On April 30, 2013, an Internal Affairs Investigation Memorandum was submitted to Police Commissioner Ramsey and to the Police Board of Inquiry for review. The disciplinary violations that IA found were sustained against Plaintiff upon the conclusion of the investigation.[4] (Doc. No. 38-7.)

On October 3, 2013, Plaintiff received a Notice of Suspension which suspended him for thirty days with the intent to dismiss. (Doc. No. 42-5.) Plaintiff remained at the DPR until the Board of Inquiry Hearing. (Doc. No. 38-4 at 68:12-13, Dec. 30, 2015.) At a Police Board of Inquiry hearing, Plaintiff was found guilty of violating the Disciplinary Code and was informed that he would be fired.[5] (Doc. Nos. 38-8 at 19:3-15, July 15, 2015; 38-10 at 8.) On October 31, 2013, Defendant Ramsey terminated Plaintiff's employment. (Doc. Nos. 38-9; 50-1 at ¶ 34.) Ramsey testified that Plaintiff was terminated for lying during an investigation, mishandling

---

[4]   The IA Memorandum detailed that the investigation sustained the following claims against Plaintiff: (i) Plaintiff was not truthful during his interview concerning his own actions after he was confronted by Meehan, once the money was thought to be missing, (ii) a departmental violation for the improper handling of the assigned officer's monetary evidence, (iii) Plaintiff conducted an improper search without a warrant while inside the second floor, front bedroom, of the Latona Street address, (iv) Plaintiff was carrying an unauthorized firearm while he was on-duty, (v) a departmental violation because he left his authorized on-duty service weapon unattended in the armrest of his unmarked Dodge Journey police vehicle while he conducted the preliminary narcotics investigation inside the Latona Street address. (Doc. No. 38-7 at 25-31.)

[5]   Plaintiff remained at the DPR until the Police Board of Inquiry Hearing. (Doc. No. 38-4 at 68:12-13, Dec. 30, 2015.) The Police Board of Inquiry Hearing was held sometime after April 30, 2013, when the IA investigation concluded, and before November 1, 2013, when Plaintiff was served with the Notice of Dismissal.

evidence, carrying an unauthorized firearm while on duty, and leaving his on-duty service weapon unattended.  (Doc. Nos. 38-9; 38-8 at 27:7-28:14, July 15, 2015.)

On May 19, 2014, after receiving notice of his termination, Plaintiff appealed the decision and had a hearing before Arbitrator David Reilly.[6]  (Doc. No. 38-10 at 9.)  The Arbitrator found in favor of the City of Philadelphia and upheld the its decision to terminate Plaintiff's employment.  (Id. at 19.)  On October 1, 2014, Plaintiff filed this civil action.  (Doc. No. 1.)

## III.     STANDARD OF REVIEW

Granting summary judgment is an extraordinary remedy.  Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  In reaching this decision, the Court must determine whether "the pleadings, depositions, answers to interrogatories, admissions, and affidavits show there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law."  Favata v. Seidel, 511 F. App'x 155, 158 (3d Cir. 2013) (quoting Azur v. Chase Bank, USA, Nat'l Ass'n, 601 F.3d 212, 216 (3d Cir. 2010) (quotation omitted)).

A disputed issue is "genuine" only if there is a sufficient evidentiary basis on which a reasonable jury could find for the non-moving party.  Kaucher v. Cnty. of Bucks, 455 F.3d 418, 423 (3d Cir. 2006) (citing Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986)).  For a fact to be considered "material," it "must have the potential to alter the outcome of the case."  Favata, 511 F. App'x at 158.   Once the proponent of summary judgment "points to evidence

---

[6]  Plaintiff was employed under the City's collective bargaining agreement with the Police Officers' Union.  (Doc. No. 50-1 at ¶ 37.)  Pursuant to the collective bargaining agreement, Plaintiff was able to appeal the termination decision, and challenge this decision at an arbitration hearing.  (Doc. No. 38-4 at 160:4-13.)

demonstrating no issue of material fact exists, the non-moving party has the duty to set forth specific facts showing that a genuine issue of material fact exists and that a reasonable factfinder could rule in its favor."  Id. (quoting Azur, 601 F.3d at 216 (internal quotation marks omitted)).

In deciding a motion for summary judgment, "[t]he evidence of the nonmovant is to be believed, and all justifiable inferences are to be drawn in his favor."  Id. (quoting Chambers ex rel. Chambers v. Sch. Dist. of Philadelphia Bd. of Educ., 587 F.3d 176, 181 (3d Cir. 2009) (quotation omitted)).  The Court's task is not to resolve disputed issues of fact, but to determine whether there exist any factual issues to be tried.  Anderson, 477 U.S. at 247-49.  Whenever a factual issue arises which cannot be resolved without a credibility determination, at this stage the Court must credit the non-moving party's evidence over that presented by the moving party.  Id. at 255.  If there is no factual issue, and if only one reasonable conclusion could arise from the record regarding the potential outcome under the governing law, summary judgment must be awarded in favor of the moving party.  Id. at 250.

## IV. ANALYSIS

The following violations are alleged against the named Defendants in the First Amended Complaint:

1. Count I alleges a violation of his First Amendment right to Free Speech under 42 U.S.C. § 1983 against Defendants Ramsey, Williams, Wixted and Meehan.  (Doc. No. 29 at 13.) (See also Doc. No. 10.)

2. Count II alleges a violation of his Second Amendment right to keep and bear arms under 42 U.S.C. § 1983 against Defendants Ramsey, Williams, Wixted, and John/Jane Does. (Doc. No. 29 at 15.)  (See also Doc. No. 10.)

3.  Count III alleges a violation of the Fourth Amendment right not to be subject to an unreasonable search and seizure, and failure to supervise and/or stop a civil rights violation under 42 U.S.C. § 1983 against Defendants Ramsey, Williams, Wixted, and Meehan.  (Doc. No. 29 at 16.)  (See also Doc. No. 10.)

4.  Count IV has been withdrawn by Plaintiff.  (Doc. No. 42 at 28.)

5.  Count V alleges a violation of the Fourteenth Amendment Right to Due Process and Equal Protection under 42 U.S.C. § 1983 against Defendants, Ramsey, Williams, Wixted, Meehan, and Sergeant Doe.  (Doc. No. 29 at 18.)  Plaintiff withdrew his Fourteenth Amendment Equal Protection claim based on race at the pre-trial conference held with counsel for all parties on November 30, 2016.

6.  Count VI alleges a Monell violation under 42 U.S.C. § 1983 against the City of Philadelphia.  (Doc. No. 29 at 19.)

7.  Count VII has been withdrawn by Plaintiff.  (Doc. No. 42 at 33.)

8.  Count VIII has been withdrawn by Plaintiff.  (Doc. No. 42 at 33.)

9.  Count IX alleges a claim of Intentional Infliction of Emotional Distress against Defendants Ramsey, Meehan, Williams, Wixted, John/Jane Does and the City of Philadelphia.  (Doc. No. 29 at 25.)

10. Count X alleges a violation of the Pennsylvania Constitution Art. I, sec. 1, 7, 25 and 26 against Defendants Ramsey, Williams, Wixted, Meehan, and John/Jane Does.

11. Count XI alleges a violation of the Pennsylvania Constitution Art. I, sec. 11 against Defendants Ramsey, Williams, Wixted, Meehan and John/Jane Does.

Defendants have moved for summary judgment on the claims remaining in the First Amended Complaint.  (Doc. No. 38 at 2.)

### A. First Amendment Retaliation Claim

Plaintiff alleges that Defendants Ramsey, Williams, Wixted, and Meehan retaliated against him because he engaged in protected speech. (Doc. No. 29 at 13.) The protected speech was at the very least his report of corruption to Wixted about the improper property receipts. Defendants agree that Plaintiff's speech is protected, but argue in the Motion for Summary Judgment that Plaintiff has not produced evidence that his speech was a substantial or motivating factor in any adverse employment action taken against him. (Doc. No. 38 at 5.)

"To establish a First Amendment retaliation claim, a public employee must show that (1) his speech is protected by the First Amendment and (2) the speech was a substantial or motivating factor in the alleged retaliatory action, which, if both are proved, shifts the burden to the employer to prove that (3) the same action would have been taken even if the speech had not occurred." Scrip v. Seneca, No. 15-2637, 2016 WL 3162695, at *2 (3d Cir. June 7, 2016) (citing Dougherty v. Sch. Dist. Of Phila., 772 F.3d 979, 986 (3d Cir. 2014)).

A plaintiff must show that there was a causal link between his alleged protected activity of free speech and the termination of his employment. Kovac v. Pennsylvania Turnpike Comm'n, 444 F. App'x 588, 590 (3d Cir. 2011). To establish this causal link, "a plaintiff usually must prove either (1) an unusually suggestive temporal proximity between the protected activity and the allegedly retaliatory action, or (2) a pattern of antagonism coupled with timing to establish a causal link."[7] Id. (citing Lauren W. ex rel Jean W. v. DeFlaminis, 480 F.3d 259, 267 (3d Cir. 2007)). The Third Circuit has held "[i]n the absence of these elements . . . evidence of causation may be 'gleaned from the record as a whole.'" Kovac, 444 F. App'x at 590 (citing Farrell v. Plainters Lifesavers Co., 206 F.3d 271, 281 (3d Cir. 2000)). If a "reasonable inference

---

[7] Here, there is no evidence that shows a pattern of antagonism.

can be drawn that an employee's speech was at least one factor considered by an employer in deciding whether to take action against the employee," summary judgment is inappropriate. Merkle v. Upper Dublin Sch. Dist., 211 F.3d 782, 785 (3d Cir. 2000).

The critical issue here is whether Plaintiff's protected speech in reporting the corruption was a substantial motivating factor in the alleged retaliatory action. In this case, viewing the evidence in light most favorable to the non-moving party, Plaintiff has produced evidence showing there is a genuine issue of fact as to whether his speech was a substantial motivating factor for retaliation by Defendants Meehan and Wixted. In view of these legal precepts and facts produced, summary judgment on the First Amendment retaliation claim will not be granted as to Defendants Meehan and Wixted. The Motion for Summary Judgment, though, will be granted as to Defendants Ramsey and Williams.

### i.   Defendant Ramsey

Defendant Ramsey, who as Police Commissioner was the only official who could fire Plaintiff, testified at his deposition that he was unaware of any report of corruption. (Doc. No. 38-8 at 81:8-18, July 15, 2015.) The record shows that the reasons for Plaintiff's firing by Ramsey were that he lied during an investigation, mishandled evidence, carried an unauthorized firearm while on duty, and left his on-duty service weapon unattended. (Doc. No. 38-9.)

The only evidence in the record that Defendant Ramsey knew about the reported corruption is the speculative testimony Plaintiff gave in his deposition. This allegation has no other support in the record. In Kovac v. Pennsylvania Turnpike Comm'n, the Third Circuit held that a plaintiff who relies solely upon his own speculative testimony, and not much else, to prove retaliation has not provided sufficient evidence to defeat a motion for summary judgment. 444 F. App'x 588, 591 (3d Cir. 2011). In that case, the plaintiff relied on his own testimony in an

effort to prove that negative political comments he made and his refusal to show loyalty to his union were substantial factors his employer considered in making the decision to terminate him. Id. at 589-91.  The Third Circuit found that the plaintiff's reliance on his own testimony, without more, was insufficient to defeat the motion for summary judgment.  Id. at 591-92.  Similarly, here, Plaintiff relies almost exclusively on his own testimony to show that his report of corruption was a substantial or motivating factor in Defendant Ramsey's decision to terminate his employment.  Plaintiff has offered no corroborating evidence to support the allegation that Ramsey knew of his report of corruption.  Because the record is barren of evidence that Ramsey's actions were based on retaliation for protected speech, the Motion for Summary Judgment on Count I will be granted as to Defendant Ramsey.

### ii.  Defendant Williams

As noted, Plaintiff testified he believed that Defendant Williams was aware of his report of corruption to Wixted and to the F.B.I. through the Internal Affairs investigation.  (Doc. No. 42 at 8; Doc. No. 38-2 at 164:8-165:14, Aug. 12, 2015.)  Defendants argue that there is no evidence that Williams knew of Plaintiff's report of corruption to Wixted. (Doc. No. 38 at 8.)

On September 26, 2012, Williams started to investigate Plaintiff's involvement in the Latona Street incident.  (Doc. No. 38-5 at 122:2-7, July 15, 2015.)  He sought a warrant for Plaintiff's DNA and fingerprints.  The DNA was collected by oral swab on October 4, 2012. (Id.)  The Internal Affairs investigation resulted in "sustained" allegations that Plaintiff lied during an investigation, mishandled evidence, carried an unauthorized firearm, and violated a department policy when he left his on-duty weapon unattended.  (Doc. No. 38-7 at 25-31.)  The Internal Affairs report was upheld by the Police Board of Inquiry and was cited as the reason for termination.  (Doc. Nos. 38-8 at 19:3-15; 38-9; 38-10 at 8.)

There is no evidence that Defendant Williams knew of Plaintiff's report of corruption during the Internal Affairs investigation. Therefore, the Motion for Summary Judgment on Count I will be granted as to Defendant Williams.

### iii. Defendant Meehan

Plaintiff testified that he believed that Defendants Meehan, Williams, and Ramsey were aware through the Internal Affairs investigation of his report of Meehan's corruption to Wixted and to the F.B.I. (Doc. No. 42 at 8; Doc. No. 38-2 at 164:8-165:14, Aug. 12, 2015.) Plaintiff also claims that it was only after his report to Defendant Wixted that his relationship with Meehan started to deteriorate. (Doc. No. 38-2 at 164:15-165:14, Aug. 12, 2015.) Defendant Meehan was the officer who alleged that money was missing from the Latona Street address. (Doc. No. 83-2 at 133:14-19, Aug. 12, 2015.) Meehan called Internal Affairs, which prompted the investigation into Plaintiff's involvement in the Latona Street incident. (Doc. No. 38-3 at 65:9-12, July 15, 2015.) The investigation took place within months of Plaintiff's protected speech and led to his eventual termination. An inference arises that Defendant Meehan was motivated to report Plaintiff to Internal Affairs due to Plaintiff's report that Meehan was engaged in corruption. Thus, as to Defendant Meehan, there is a genuine dispute of material facts on the retaliation claim. Therefore, the Motion for Summary Judgment on Count I as to Defendant Meehan will be denied.

### iv. Defendant Wixted

Defendants argue that Plaintiff failed to produce any evidence that Defendant Wixted engaged in any retaliatory actions. (Doc. No. 38 at 10.) Plaintiff informed Wixted of the corruption by Meehan. (Doc. No. 42 at 18.) Subsequently, Wixted was involved in opening the

Internal Affairs investigation into Plaintiff's conduct.   This investigation led to his eventual termination.  (Doc. No. 38-3 at 65:9-12, July 15, 2015.)

A genuine issue of material fact exists as to whether Wixted was involved in the series of events Plaintiff alleges is retaliatory, such as the Internal Affairs investigation, his move to the DPR, the reduction in salary, the negative press release, and his termination.  (Doc. No. 42 at 18.)  Therefore, the Motion for Summary Judgment on Count I against Defendant Wixted will be denied.

  **v. Statute of Limitations Regarding Defendant Meehan**

Defendants argue that Plaintiff's First Amendment Retaliation claim against Defendant Meehan is barred by the statute of limitations.  (Doc. No. 38 at 10.)  Defendants argue that the First Amendment retaliation claim accrued on September 26, 2012, when Defendant Meehan was involved in the Latona Street search and claimed money was missing from the Latona Street address.  (Doc. No. 42 at 9.)  This argument is unavailing.  After Plaintiff reported Meehan's alleged corruption in August of 2012 to Wixted, Meehan accused Plaintiff of taking money from the Latona Street address on September 26, 2012, which led to the Internal Affairs investigation and Plaintiff's eventual termination.   The acts of retaliation including the Internal Affairs investigation, his move to the DPR, the reduction in salary, the negative press release, and his termination occurred within two years of the date of the filing of the Complaint on October 1, 2014, and thus are not time barred.

The statute of limitations for a § 1983 claim arising in Pennsylvania is two years. Wallace v. Fed. Employees of U.S. Dist. Court, EDPA, 325 F. App'x 96, 100 n.3 (3d Cir. 2009) (citing Kost v. Kozakiewicz, 1 F.3d 176, 186-90 (3d Cir. 1993)).  "A claim accrues in a federal cause of action as soon as a potential claimant either is aware, or should be aware, of the

existence of and source of an injury." Oshiver v. Levin, Fishbein, Sedran & Berman, 38 F.3d 1380, 1386 (3d Cir. 1994).   There is an exception to this rule.   The running of the statutory limitations period is delayed until the "plaintiff has discovered or, by exercising reasonable diligence, should have discovered (1) that he or she has been injured, and (2) that this injury has been caused by another party's conduct." Id. (citing Bohus v. Beloff, 950 F.2d 919, 925 (3d Cir 1991)).

Viewing the facts in light most favorable to the Plaintiff, the earliest date he could have known about retaliation was when he was under investigation for stealing money at the drug house was September 26, 2012.   (Doc. No. 38-2 at 179:24-181:15, Aug. 12, 2015.)    But Plaintiff's retaliation claim did not accrue until adverse action was taken against him.   As noted, the retaliation included the Internal Affairs investigation, his move to the DPR, the reduction in salary, the negative press release, and his termination.   Therefore, the last date that Plaintiff knew or should have known of his injury was October 31, 2013, when he was officially terminated by Defendant Ramsey and received the Notice of Dismissal.   (Doc. No. 38-9.)   Plaintiff filed this civil suit on October 1, 2014, within two years of the accrual date of his claim.   (Doc. No. 1.) Consequently, the Motion for Summary Judgment on Count I based on the statute of limitations will be denied.

**B. Claim Under the Second Amendment**

Plaintiff is challenging the City of Philadelphia's "return of gun practice, for a seized gun (regardless of how the seizure occurred)."   (Doc. No. 42 at 19.)   Defendant argues that "Plaintiff's claim fails because he is unable to establish that Defendants Ramsey, Williams and Wixted violated his Second Amendment rights, as he has not produced evidence that they were

responsible for the seizure, that the weapon was his only firearm or that he is unable to purchase another firearm." (Doc. No. 38 at 11.)

The Second Amendment protects "the right of the people to keep and bear arms." U.S. CONST. amend. II.  Nevertheless, the United States Supreme Court has recognized that "the right secured by the Second Amendment is not unlimited." Dist. Of Columbia v. Heller, 554 U.S. 570, 626 (2008).  The Third Circuit has established a two-prong test that governs Second Amendment challenges:

> First, we ask whether the challenged law imposes a burden on conduct falling within the scope of the Second Amendment's guarantee.  If it does not, our inquiry is complete.  If it does, we evaluate the law under some form of means-end scrutiny.  If the law passes muster under the standard, it is constitutional.  If it fails, it is invalid.

United States v. Marzzarella, 614 F.3d 85, 89 (3d Cir. 2010).  See also Binderup v. Attorney General United States of America, 836 F.3d 336, 339 (3d Cir. 2016) (reaffirming the Marzzarella two-step test).

Plaintiff contends that the City of Philadelphia and the Police Department's gun return policy infringes on Plaintiff's right to bear arms.  (Doc. No. 42 at 20.)  The challenged policy, however, does not impose a burden on Plaintiff's right to keep and bear arms generally, but rather his right to bear the particular personal weapon that was seized on September 26, 2012.[8] Plaintiff presents no evidence that he could not obtain another firearm.  In fact, his personal firearm was returned to him by Defendant Wixted.  (Doc. No. 38-4 at 15:22-16:13, Dec. 30, 2015.)

---

[8]  The actual policy has not been made part of the record in this case by any party.  But based on the facts presented here, the alleged policy did not infringe on Plaintiff's Second Amendment rights.

While the Third Circuit has not addressed the narrow issue of the right to keep and bear a particular gun, "the Eighth Circuit held in *Walters v. Wolf* that the seizure of a particular gun does not constitute a violation of the Second Amendment when the Plaintiff is later able to purchase another gun." Houston v. City of Philadelphia, No. 13-4442, 2015 WL 4404853, at *6 (E.D. Pa July 20, 2015) (Rufe, J.) (citing Walters v. Wolf, 660 F.3d 307, 317-18 (8th Cir. 2011)). Thus, the challenged policy here does not burden conduct falling within the scope of the Second Amendment's guarantee, and therefore is constitutional under the Marzzarella test.

Moreover, Plaintiff does not present evidence that the cited policy prohibits him from availing himself of a procedure for the return of his personal firearm. Pennsylvania law provides a process to challenge the seizure of property and a protocol to request its return. Pennsylvania Criminal Procedure Rule 588(A) states:

> A person aggrieved by a search and seizure, whether or not executed pursuant to a warrant, may move for the return of the property on the ground that he or she is entitled to lawful possession thereof. Such motion shall be filed in the court of common pleas for the judicial district in which the property was seized.

Pa. Rules Crim. Proc. Rule 588(A). "Pennsylvania Rule of Criminal Procedure 558 provides an adequate post-deprivation remedy when police seize property pursuant to an investigation." McKenna v. Portman, 538 F. App'x 221, 225 (3d Cir. 2013) (footnote and citations omitted). Plaintiff has not presented any evidence that he followed this procedure or any other procedure that the Philadelphia Police Department may have had in place for the return of firearms. Therefore, the Motion for Summary Judgment on Count II will be granted and this claim will be dismissed.

### C. Fourth Amendment Unreasonable Search and Seizure Claim

Plaintiff claims that he was subject to an unreasonable search and seizure under the Fourth Amendment by Defendants Ramsey, Wixted and Williams on September 26, 2012, when

17

he was strip searched.  (Doc. No. 29 at 17.)   Plaintiff also alleges that Defendant Ramsey violated his Fourth Amendment right by failing to supervise and/or stop a civil right violation in regard to the DNA and fingerprint search and seizure.  In addition, Plaintiff alleges Defendant Williams made false statements in the search warrant application which invalidates the search warrant.  (Id. at 16-17.)[9]

### i.    Strip Search and Seizure of Firearms on September 26, 2012

Plaintiff argues that he was subjected to an unreasonable strip search and seizure of firearms by Defendants Ramsey, Wixted, and Williams on September 26, 2012.  (Doc. No. 29 at 17.)  On October 1, 2014, Plaintiff filed this suit.  (Doc. No. 1.)  Defendants argue that this claim is barred by the two year Statute of Limitations.  (Doc. No. 38 at 13.)  Plaintiff concedes this point.  (Doc. No. 42 at 22.)

Therefore, Defendants' Motion for Summary Judgment on Count III as to the unreasonable strip search and seizure of the firearms on September 26, 2012 will be granted. This claim will be dismissed against Defendants Ramsey, Williams, Wixted, and Meehan.

### ii.    Taking of Plaintiff's DNA and Fingerprints

Defendants argue Plaintiff has not produced any evidence that Defendant Ramsey was personally involved in or supervised the taking of the DNA and fingerprints.  (Doc. No. 38 at 13.)   Defendants also argue that because the collection of the DNA and fingerprints were authorized by a warrant, this claim must fail.  (Id.)

---

[9]   While Defendant Meehan was named in the First Amended Complaint as a Defendant in Count III, the search and seizure count (Doc. No. 29 at 16), Plaintiff has not argued in the Motion for Summary Judgment that Defendant Meehan was involved in any of the alleged illegal searches and seizures.  For this reason, he will be dismissed as a Defendant in Count III.

### a.   Defendant Ramsey – Failure to Supervise

Plaintiff relies on a supervisory liability theory in contending that Defendant Ramsey is responsible for the collection of the DNA and fingerprints.  Plaintiff argues that "Defendant Williams' DNA search was directed to be done by Ramsey."  (Doc. No. 42 at 24.)

In a § 1983 action, a supervisor can be found liable if he participates in violating the plaintiff's rights, directs his subordinates to violate the plaintiff's rights, or as a person in charge, had knowledge of and acquiesced in his subordinates' violations.  42 U.S.C. § 1983;  Santiago v. Warminster Tp., 629 F.3d 121, 128-29 (3d Cir. 2010).  "[A] plaintiff asserting a failure to supervise claim must not only identify a specific supervisory practice that the defendant failed to employ, he or she must also allege 'both (1) contemporaneous knowledge of the offending incident or knowledge of a prior pattern of similar incidents, and (2) circumstances under which the supervisor's inaction could be found to have communicated a message of approval." C.H. ex rel. Z.H. v. Oliva, 226 F.3d 198, 202 (3d Cir. 2000) (citing Bonenberger v. Plymouth Township, 132 F.3d 20, 25 (3d Cir. 1997)).

Plaintiff has failed to produce any evidence that Defendant Ramsey directed the taking of Plaintiff's DNA or fingerprints, or that he was even aware at the time of their taking.  (Doc. No. 38 at 14-15.)  Ramsey testified that he did not play any part in directing Plaintiff to appear and submit to the DNA search.  (Doc. No. 39-8 at 80:1-3, July 15, 2015.)  Plaintiff has not submitted any evidence to the contrary other than his own speculative testimony.

Therefore, the Motion for Summary Judgment on Count III as to Defendant Ramsey will be granted.  This claim will be dismissed against Defendant Ramsey.

### b.   Defendant Williams

Plaintiff argues that Defendant Williams made false statements in his affidavit in support of a search warrant which authorized the taking of Plaintiff's DNA and fingerprints.  Plaintiff contends that such action invalidates the search warrant for his DNA and fingerprints and renders the search illegal under the Fourth Amendment.  (Doc. No. 42 at 25.)

> In discussing the validity of search warrants, the Third Circuit has stated as follows:
>
> A search warrant is valid if supported by probable cause that particular contraband or evidence will be found in a particular place.  To defeat probable cause, a plaintiff must show that misstatements in a warrant affidavit were material, or necessary, to the finding of probable cause, and were made knowingly and deliberately, or with a reckless disregard for the truth.

McKinney v. Prosecutor County Prosecutor's Office, 612 F. App'x 62, 66-67 (3d Cir. 2015).

Defendant Williams testified that he applied for the search warrant and it was signed by a Magistrate Judge.  (Doc. No. 38-5 at 124:15-18, July 15, 2015.)  Plaintiff asserts that Defendant Williams not only provided false information in the affidavit for the search warrant, but also omitted certain information that would have influenced the Magistrate Judge in deciding whether to issue the search warrant for the DNA and fingerprints.  (Doc. No. 38-4 at 143:20-153:11, Dec. 30, 2015.)  Plaintiff argues that the allegedly false statements and omissions were critical to the probable cause finding.  (Doc. No. 42 at 29.)

> The affidavit in relevant part states as follows:
>
> On 9-26-12, at approximately 5:16PM, Philadelphia Police Officer Kevin Gorman and Philadelphia Police Officer James O'Neill assigned to the 3[rd] District, responded to 1236 Latona Street for a radio call report of a "Person with a Gun." Police Officer Gorman and Police Officer O'Neill were met at the residence by Ms. Debra O'Mara who permitted the Police Officers to enter her home to check the property for any victims.  While Police Officer Gorman and Police Officer O'Neill were checking the property, the Officers observed alleged crystal methamphetamine in plain view on the dining room table.  The Police Officers notified the Narcotics Field Unit-South and secured the property for a Search and Seizure Warrant.

On 9-26-16, Philadelphia Police Sergeant Thomas Meehan assigned to the Narcotics Field Unit-South, went to 1236 Latona Street and conducted a cursory plain view check of the property. Sergeant Meehan went to the front bedroom of the property and observed an open make-up bag and alleged crystal methamphetamine in plain view on the vanity. Sergeant Meehan also observed an open purse containing U.S.C. lying on the bed. Sergeant Meehan counted the money from the make-up bag and the purse, which totaled approximately $1,400.

Sergeant Meehan left the money in the front bedroom and exited the house to retrieve evidence bags from his unmarked Police car. Sergeant Meehan returned to the front bedroom and observed Philadelphia Police Officer Gerald Passalacqua and Police Officer Gorman standing next to the bed with the money strewn across the bed. Sergeant Meehan instructed Police Officer Passalacqua and Police Officer Gorman to vacate the front bedroom and Sergeant Meehan recounted the money on the bed. The recount of the money totaled approximately $500.

Sergeant Meehan exited the property and saw Police Officer Passalacqua open the door and enter a 20 silver Dodge Journey . . . to retrieve a bottle of water. Police Officer Passalacqua was utilizing the Doge Journey as his unmarked Police vehicle.

Sergeant Meehan conducted another cursory check of the bedroom for the missing money which did no[t] produce the unaccounted approximate $900.

Police Officer Passalacqua, Police Officer Gorman, and Police Officer O'Neill denied knowing what occurred with the missing money from the front bedroom.

On 9-27-12, Police Officer Simmons submitted the seized $880 to the Philadelphia Police Department Evidence Custodian to be secured and guarded for fingerprints.

Based on this information a search and seizure warrant from any and all DNA samples, oral swab, blood sample, as well as latent fingerprints from Police Officer Gerald Passalacqua are requested to compare D[NA] and fingerprints on file, and DNA and forensic evidence recorded from the seized $880 from Search and Seizure Warrant #168045.

(Doc. No. 38-6 at 2-3.)

The false statements that Plaintiff relies on are as follows:

Williams wrote in the affidavit that Meeh[a]n counted approximately $1400. While it is accurate, it is not that Meeh[a]n "left the money to retrieve evidence bags." Indeed, Sgt. Counted the money and left where he met Plaintiff in the street and told Plaintiff to go see officers O'Neill and Gorman in the house. It is

also untrue that Meeh[a]n instructed Passalacqua and Gorman to vacate the bedroom, and he then recounted the money totaling $500.00.. [sic]  Meeh[a]n also did not "exit the home and saw Pasalacqua [sic] in a 20 silver Dodge…" or do "another cursory check of the bedroom for the missing money which did not produce the unaccounted approximately $900,00 [sic]."

(Id. at 27.)

The omissions that Plaintiff relies on, for example, are that Plaintiff was strip searched twice on the day the money was claimed missing and no money was found on him, and that his car was searched.  (Id.)  Whether Defendant Williams knowingly provided false information and omitted critical facts and whether those facts were material to the Magistrate Judge's finding of probable cause to collect Plaintiff's DNA and fingerprints are genuine issues of fact in this case. Therefore, the Motion for Summary Judgment on Count IV as to Defendant Williams will be denied.

### D.  Fourteenth Amendment Claim – **Loudermill** Hearing

Plaintiff claims he was deprived of procedural due process by not being afforded a valid Loudermill hearing where he should have been given the opportunity to contest the adverse employment decisions made against him.  In particular, Plaintiff contends that he should have been provided with an opportunity to speak on the Police Department's decision to deny him equal pay by moving him to the DPR, and on the decision to suspend and/or terminate him. (Doc. No. 29 at ¶ 117.)  The parties disagree as to whether Plaintiff had the right to a Loudermill hearing when there are arbitration procedures in place.  (See Doc. Nos. 38 at 18; 42 at 30.)

The proceeding known as a Loudermill hearing was first discussed in the United States Supreme Court decision Cleveland Bd. of Educ. V. Loudermill, which held that a public employee who has a constitutionally protected interest in his job has a right to a hearing before being terminated.  470 U.S. 532, 542 (1985).  Although the court did not specify the exact

procedures required at such a hearing, it did stress the important elements of the hearing—notice and an opportunity to respond.  Montanye v. Wissahickon Sch. Dist., 399 F.Supp.2d 615, 621 (3d Cir. 2005).  As the Supreme Court explained, "An essential principle of due process is that a deprivation of life, liberty, or property be preceded by notice and opportunity for hearing appropriate to the nature of the case."  Loudermill, 470 U.S. at 542.  "The tenured public employee is entitled to oral or written notice of the charges against him, an explanation of the employer's evidence, and [an] opportunity to present his side of the story."  Id. at 546.

In Leheny v. City of Pittsburgh, the Third Circuit explained

[When] a due process claim is raised against a public employer, and grievance and arbitration procedures are in place, . . . those procedures satisfy due process requirements . . . .  Grievance procedures outlined in a collective bargaining agreement can satisfy due process requirements.  Because [the former police officer] testified that he received the arbitration award and attended a meeting in which the award was explained, he is deemed to have been aware of the applicable grievance procedure.

Leheny v. City of Pittsburgh, 183 F.3d 220, 228-29 (3d Cir. 1999) (citing Dykes v. SEPTA, 68 F.3d 1564, 1571 (3d Cir. 1995); Jackson v. Temple Univ., 721 F.2d 931, 933 (3d Cir. 1983)).  The Third Circuit found that the due process claims in Leheny were properly dismissed because the police officer was aware of the grievance procedure, but did not follow it.  Id. at 229.

Here, Plaintiff contends that he was not given the opportunity to present his side of the story.  (Doc. No. 42 at 30.)  In contrast, Defendants argue that because Williams interviewed Plaintiff concerning the allegations made against him in the Internal Affairs investigation, and Plaintiff was afforded a Police Board of Inquiry hearing and an arbitration proceeding, he was able to give his side of the story and be heard.  (Doc. No. 38 at 18.)

Plaintiff was employed under the City's collective bargaining agreement with the Police Officers' Union.  (Doc. No. 50-1 at ¶ 37.)  He was notified of his suspension with intent to

23

dismiss, had a Police Board of Inquiry hearing, and was informed that he would be officially terminated.  (Doc. Nos. 42-5; 38-4 at 68:12-69:17, Dec. 30, 2015.)   After receiving notice of dismissal, Plaintiff appealed his termination, in accordance with his collective bargaining agreement, and had an arbitration hearing.  (Id. at 160:4-13.)  On May 19, 2014, the arbitration proceeding was held and "the parties each had a full opportunity to present evidence and argument in support of their respective positions." (Doc. No. 38-10 at 9.)  Plaintiff therefore had a full and fair opportunity to give his side of the story to Defendant Williams, and at both the Police Board of Inquiry hearing and the arbitration hearing.  At the very least, the Police Board of Inquiry hearing was held before Plaintiff was officially terminated, and therefore he was afforded a full opportunity to a hearing before being terminated, satisfying the Loudermill requirements.  (Doc. No. 38-4 at 68:12-13, Dec. 30, 2015.)

Moreover, Plaintiff was clearly aware that his collective bargaining agreement afforded him an opportunity to arbitrate his termination because he did so.  While the arbitration was held after Plaintiff was officially terminated, the Third Circuit has held that this procedure satisfies the due process requirements of notice and an opportunity to be heard.  See Leheny, 183 F.3d at 228.  Thus, all the requirements of the Loudermill hearing have been satisfied here.

Accordingly, the Motion for Summary Judgment on Count V with respect to the procedural due process claim will be granted.

### E.  City of Philadelphia as a Defendant

The City of Philadelphia is named as a Defendant in Count VI.  Plaintiff argues that the City should be held liable for implementing a policy or custom which led to the deprivation of his constitutional rights.  In particular, Plaintiff argues that the City of Philadelphia violated his Second Amendment right when it confiscated his firearm.  (Doc. No. 42 at 32.)  Plaintiff also

argues that the City of Philadelphia violated his right to be free from unreasonable searches and seizures under the Fourth Amendment when it allowed Defendant Williams to obtain Plaintiff's DNA and fingerprints.  (Id.)

The Supreme Court has held that a municipality can be liable for a deprivation of an employee's constitutional rights under certain limited circumstances.  Monell v. Dep't of Soc. Servs. of City of New York, 436 U.S. 658 (1978).  As one court explained:

> Under Monell v. Dep't of Soc. Servs. of City of New York, 436 U.S. 658 (1978), a municipality can be found liable when 'execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury that the government as an entity is responsible under §1983.

Johnson v. City of Philadelphia, 105 F. Supp. 3d 474, 482 (E.D. Pa. 2015) (citing Monell, 436 U.S. at 694).  A plaintiff bears the burden of providing evidence that the identified "policy or custom was the proximate cause of the injuries suffered."  Watson v. Abington Twp., 478 F.3d 144, 155 (3d Cir. 2007).  "[A] plaintiff must show that an official who has the power to make policy is responsible for either the affirmative proclamation of a policy or acquiescence in a well-settled custom."  Id. at 156.

Defendant argues that Plaintiff has not identified any policy or custom of the City of Philadelphia that was the moving force behind the alleged violations of his constitutional rights. (Doc. No. 38 at 21.)  With regard to Plaintiff's allegation that his Fourth Amendment right to be free from unreasonable searches and seizures was violated when the City obtained Plaintiff's DNA and fingerprints, Plaintiff has failed to specifically identify any policy or custom of the City that violated this right.  As to Plaintiff's allegation that the City of Philadelphia violated his Second Amendment right to bear arms when his personal firearm was confiscated, Plaintiff does not provide the language of the gun return policy.  (See Doc. No. 42 at 32.)  Moreover, as found

25

above, no Second Amendment violation occurred here, regardless of the wording of any alleged policy in place.  Therefore, the Motion for Summary Judgment will be granted on Count VI and the City of Philadelphia is dismissed as a Defendant.

### F.  State Law Claim for Intentional Infliction of Emotional Distress

Defendants argue that Plaintiff's claim of Intentional Infliction of Emotional Distress against all Defendants fails.  Specifically, Defendants assert that summary judgment should be granted on this claim because the City of Philadelphia is immune from liability for intentional torts, and that Plaintiff has not proven the other named Defendants engaged in outrageous conduct.[10]  (Doc. No. 38 at 23.)

#### i.    City of Philadelphia

Intentional Infliction of Emotional Distress is an intentional tort, and this claim against the City of Philadelphia is governed by the Tort Claims Act, which states in relevant part:

> Except as otherwise provided in this subchapter, no local agency shall be liable for any damages on account of any injury to a person or property caused by any act of the local agency or an employee thereof or any other person.

42 Pa. Cons. Stat. § 8541.  "The clear intent of the Tort Claims Act was to insulate the government from exposure to tort liability."  McShea v. City of Philadelphia, 995 A.2d 334, 341 (Pa. 2010); Panas v. City of Philadelphia, 871 F. Supp. 2d 370, 375 (E.D. Pa. 2012).  Under this statute, the City of Philadelphia is immune from suit for Intentional Infliction of Emotional Distress and Defendants' Motion for Summary Judgment on this claim will be granted.

---

[10]  Although Plaintiff asserts that his Intentional Infliction of Emotional Distress claim is against all Defendants, he only mentions the following individuals as being liable for this claim in his First Amended Complaint:  Defendants Ramsey, Williams, and Meehan.  (Doc. No. 29 at 25.) Because this claim was raised against all Defendants, this Court will address whether summary judgment should be granted for all individual Defendants.

###### ii.    Defendants Ramsey, Williams, Wixted and Meehan

Plaintiff also alleges an Intentional Infliction of Emotional Distress claim against Defendants Ramsey, Williams, Wixted and Meehan.  (Doc. No. 29 at 25.)  The Second Restatement of Torts § 46 sets forth the elements required to satisfy the cause of action for intentional infliction of emotional distress.  Cheney v. Daily News L.P., No. 15-2251, 2016 WL 3902639, at *4 (3d Cir. July 19, 2016).  It states:

> One who by extreme and outrageous conduct intentionally or recklessly causes severe emotional distress to another is subject to liability for such emotional distress, and if bodily harm to the other results from it, for such bodily harm.

Restatement (Second) of Torts §46 (1965).  In order to recover on a claim for intentional infliction of emotional distress, "a plaintiff must show conduct so extreme and outrageous that it intentionally or recklessly caused him severe emotional distress." Lawson v. Pennsylvania SPCA, 124 F. Supp. 3d 394, 409 (E.D. Pa. 2015).  "In Pennsylvania, liability on an intentional infliction of emotional distress claim has been found only where the conduct has been so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community." Kasper v. Cnty. Of Bucks, 514 F. App'x 210, 217 (3d Cir. 2013).  It is for the court to determine in the first instance whether the conduct is extreme and outrageous, such that recovery may be permitted.  Cheney, 2016 WL 3902639, at *4 (citing Small v. Juniata College, 682 A.2d 350, 355 (1996)).

The Third Circuit recently provided guidance on what is considered outrageous conduct under the standard for intentional infliction of emotional distress.  In Cheney, the Court of Appeals wrote:

> Pennsylvania courts have found extreme and outrageous conduct only in the most egregious of situations, such as mishandling of a corpse, reckless diagnosis of a

> fatal disease, and having sexual contact with young children.  *See Salerno v.*
> *Phila. Newspapers, Inc.*, 546 A.2d 1168, 1172 (1988) (collecting cases).
> Although suggesting that a person is involved in a sex scandal is unfortunate, it
> does not rise to the level of conduct necessary to state a cause of action for
> intentional infliction of emotional distress under Pennsylvania law.

Cheney, 2016 WL 3902639, at *4.  None of the outrageous conduct Plaintiff has alleged here is
similar to the egregious situations mentioned in Cheney.

> Here, Plaintiff argues:
>
> [T]he defendants lied to the public and did so through a press release and
> publically accused plaintiff of stealing.   At that time, DNA testing and the
> [Internal Affairs] investigation cleared Plaintiff of stealing the 'missing money.'
> Indeed, the [District Attorney's] office declined to prosecute Plaintiff because of
> poor supporting facts [that] there was even a theft. . . . Plaintiff was denied even
> minimal Loudermill due process for the terminat[ion] from employment after and
> likely because plaintiffs [sic] reported corruption to police and the [Federal
> Bureau of Investigation].  Any reasonable jury would find this to be outrageous
> and so exclaim it to the world.

(Doc. No. 42 at 33.)   Plaintiff's allegations that Defendants made false accusations of theft
against him, and that those allegations were relayed to the press, do not amount to outrageous
conduct as described by the Third Circuit in Cheney, such as "mishandling of a corpse, reckless
diagnosis, of a fatal disease, and having sexual contact with young children."  Cheney, 2016 WL
3902639, at *4.  Rather, in considering the evidence in the light most favorable to the Plaintiff,
this conduct is similar to that analyzed in Cheney—that is, false accusations of a sex scandal—
which did not rise to the level of outrageous conduct.  Because the alleged conduct is not
outrageous, summary judgment on this claim will be granted in favor of Defendants.

Yet a second reason supports granting summary judgment on this claim.  A plaintiff
seeking to establish such a claim must support his claim with "competent medical evidence"
because "it is unwise and unnecessary to permit recovery to be predicated on an inference based
on the defendant's outrageousness without expert medical confirmation that the plaintiff actually

suffered the claimed distress." Kazatsky v. King David Memorial Park, Inc., 527 A.2d 988, 995 (Pa. 1987); Bock v. CVS Pharmacy, Inc., No. 07-412, 2008 WL 3834266, at *2 (E.D. Pa. Aug. 14, 2008).

Here, Plaintiff has not produced any competent medical evidence at the summary judgment stage.  Plaintiff does refer to an expert witness who would testify at trial about Plaintiff's mental and emotional damages.  (Doc. No. 41 at 4.)  Plaintiff also has described in his deposition his emotional and mental distress and that he was taken to Hall-Mercer to be admitted.  (Doc. Nos. 38-2 at 114:4-9; 38-4 at 18:7-21-:5.)  But there is no expert or medical report offered in this record to show any manifestation of the emotional distress about which Plaintiff testified.  For this additional reason, the Motion for Summary Judgment on Plaintiff's Intentional Infliction of Emotional Distress claim will be granted against all named Defendants.

### G. Pennsylvania Constitutional Claims

In Counts X-XI, Plaintiff alleges violations of Pennsylvania Constitution, Art. I, sec. 1 (inherent rights of mankind, reputation), sec. 7 (freedom of press and speech), sec. 11 (suits against the Commonwealth, procedural due process), sec. 25 (reservation of powers in people), and sec. 26 (no discrimination by Commonwealth and its political subdivisions) against all Defendants.

"No Pennsylvania statue establishes, and no Pennsylvania court has recognized, a private cause of action for damages under the Pennsylvania Constitution." Pocono Mountain Charter Sch. v. Pocono Mountain Sch. Dist., 422 F. App'x 681, 687 (3d Cir. 2011) (finding the District Court properly dismissed the plaintiffs' claims for monetary relief under the Pennsylvania Constitution).  Pennsylvania does not have a state statute analogous to 42 U.S.C. § 1983 that authorizes a private right of action to sue for violations of the Pennsylvania Constitution.

Mazzarella v. Brady, No. 14-5654, 2016 WL 75041, at *3 (E.D. Pa. Jan. 7, 2016) (citing Jones v. City of Philadelphia, 890 A.2d 1188, 1213 (Pa. Commw. Ct. 2006), appeal denied, 909 A.2d 1291 (Pa. 2006)).   Although monetary relief is barred for claims under the Pennsylvania Constitution, equitable remedies are available, and Plaintiff can sue for injunctive relief.  Pocono Mountain Sch. Dist., 442 F. App'x at 688.

Despite these restrictions on suing for money damages, Plaintiff argues that there has been a break in the dam which allows these claims to stand.  Plaintiff cites a Third Circuit decision he believes recognizes a private right of action for violations of the Pennsylvania Constitution.  (See Doc. No. 42 at 34 citing Pfeiffer by Pfeiffer v. Marion Center Area Sch. Dist., Bd. of Sch. Directors for Marion Center Area Sch. Dist., 917 F.2d 779, 789 (3d Cir. 1990), abrogated by Fitzgerald v. Barnstable Sch. Comm., 555 U.S. 246, 255 (2009).)   But Plaintiff's argument is unavailing for several reasons.   First, Plaintiff relies on case law which has subsequently been overturned by the United States Supreme Court.   See Fitzgerald, 555 U.S. 246, 255 (2009) (abrogated on other grounds).  Second, established precedent demonstrates that there is no private cause of action for monetary damages under the Pennsylvania Constitution for such claims.  See Pocono Mountain Sch. Dist., 442 F. App'x at 688; see also Dooley v. City of Philadelphia, 153 F.Supp.2d 628, 663 (E.D. Pa. 2001) ("The Supreme Court of Pennsylvania has not decided whether a private cause of action exists under Article 1, Section 7 of the Pennsylvania Constitution.   Courts of this circuit that have considered the question have concluded that Article 1, Section 7 does not establish a private cause of action for damages.").  Third, the Pfeiffer case is distinguishable because it stated there was a private right of action under the Equal Rights Amendment of the Pennsylvania Constitution for gender discrimination, which Plaintiff is not claiming in this case.  Fourth, "Pfeiffer has been criticized by subsequent

state court decisions.  *Dillon v. Homeowner's Select, Affinity Ins. Servs.*, 957 A.2d 772, 778 (Pa. Super. Ct. 2008) (Equal Rights Amendment does not create a remedy for employment discrimination on the basis of sex against a private employer.)"  Hargrave v. Ramsey, No. 15-201, 2015 WL 2445940, at *5 (E.D. Pa. May 21, 2015) (McHugh, J.).  Therefore, the Motion for Summary Judgment as to Count X and XI for monetary damages will be granted.[11]

## V. CONCLUSION

For all the reasons stated above, the Motion for Summary Judgment will be granted in part and denied in part.

The Motion will be granted on the following claims:

1. Summary judgment will be granted in favor of Defendants Ramsey and Williams on Count I.

2. Summary judgment will be granted in favor of Defendants Ramsey, Williams, Wixted, and Does on Count II.

3. Summary judgment will be granted in favor of Defendant Ramsey on Count III on the failure to supervise allegations.  Summary judgment also will be granted in favor of Defendants Ramsey, Williams, Wixted and Meehan on Count III on the unreasonable search and seizure allegations arising from the strip search.

---

[11] See also Dooley v. City of Philadelphia, 153 F.Supp.2d 628, 663 (E.D. Pa. 2001) ("The Supreme Court of Pennsylvania has not decided whether a private cause of action exists under Article 1, Section 7 of the Pennsylvania Constitution.  Courts of this circuit that have considered the question have concluded that Article 1, Section 7 does not establish a private cause of action for damages.")

Although Plaintiff claims for monetary damages on Counts X and XI are being dismissed, his claims for injunctive relief will not be dismissed.  Pocono Mountain Sch. Dist., 442 F. App'x at 688.  Plaintiff is seeking injunctive relief as to "Plaintiff's Equal Rights and gun return practice."  (Doc. No. 42 at 34.)  A decision based on the evidence presented at trial will be made after the trial on whether injunctive relief is warranted.

4.   Summary judgment will be granted in favor of Defendants Ramsey, Williams, Wixted, Meehan, and Doe on Count V.

5.   Summary judgment will be granted in favor of the City of Philadelphia on Count VI.

6.   Summary judgment will be granted in favor of all Defendants on Count IX.

7.   Summary judgment will be granted in favor of Defendants Ramsey, Williams, Wixted, Meehan, and Doe on Counts X and XI on the claims for monetary damages only.

<u>The Motion for Summary Judgment will be denied on the following claims:</u>

1.   Summary Judgment will be denied on Count I against Defendants Meehan and Wixted.

2.   Summary judgment will be denied on Count III against Defendant Williams on the allegations of an unreasonable search and seizure regarding Plaintiff's DNA and fingerprints.

3.   Summary judgment will be denied on Counts X and XI on the request for injunctive relief.

An appropriate Order follows.